AETNA INSURANCE COMPANY ET AL. V. BEN C. HYDE, SUPERINTEND-
ENT OF INSURANCE DEPARTMENT OF STATE OF MISSOURI, AP-
PELLANT.

Court en Banc, June 23, 1926.

1. **REMEDY: Statute Later than Offense: Retroactive Application: Insur-
ance Rates.** A new enactment which only affects the remedy has no effect
upon vested rights and does not impair the obligation of contracts, and
therefore may control the decision of a case; but in an action by insurance
companies praying for a review and modification of a reduction in fire
insurance rates made by the Superintendent of Insurance before the amend-
ment of 1923 to Section 6283, Revised Statutes 1919, went into effect, the
trial court could not make a new order different from the one made by the
Superintendent, for the reason that the Superintendent could consider only
such facts and make such determinations as the law in effect at the time
he made them allowed him to make.

2. ———: ———: ———: ———: **Review by Court: New Order.** Section
6284, Revised Statutes 1919, authorizing the court to review the order of
the Superintendent of Insurance reducing the rates for fire insurance and
declaring that "upon such review the entire matter shall be treated and
determined de novo," did not authorize the trial court to make a new order
in lieu of the one made by the Superintendent; it limited the court to a
review of the order made, and to such evidence as might have been pro-
duced before the Superintendent at the time it was made.

3. ———: ———: ———: ———: **Amendment of Section 6284.** The amend-
ment of 1923 to Section 6284 that "the court shall have authority to sustain,
set aside and modify the orders and directions under review" does not relate
to the action of the Superintendent, but to the action of the trial court
reviewing it. The court, in reviewing an order of the Superintendent reduc-
ing insurance rates, must determine the case on the facts as they existed
when the order was made.

4. **INSURANCE RATES: Review of Order of Superintendent: Evidence
Available.** In reviewing an order of the Superintendent of Insurance reduc-
ing fire-insurance rates, the trial court is not limited to an investigation of
the facts which the Superintendent had before him when the order was
made, but may take into consideration any evidence produced by either party
which throws light upon the propriety of the order at the time it was made.

5. ———: **Reasonable Profit.** Under the statute (Sec. 6283, R. S. 1919)
requiring the Superintendent of Insurance to order a reduction in the future
rates of stock fire insurance companies that will limit their aggregate col-
lections "to not more than a reasonable profit," a reasonable profit is five
per cent on the underwriting business done, plus three per cent added for
conflagration hazard; and a net profit of ten per cent or more during the
preceding five years is unreasonable, and authorizes a ten per cent reduction
in future rates by the Superintendent of Insurance.

6. ———: ———: **Returns and Profits from Investments.** The Rating Act
(Sec. 6283, R. S. 1919) contemplates that fire insurance rates shall be
fixed with a view of the aggregate earnings and profits for the insurance
business done in the State. It is the business done, and not the capital
invested, that is to be taken as a basis for measuring a reasonable profit.
Earnings arising from the investment of capital and surplus are not to be
315 Mo.—8.

taken into account as a part of the underwriting profit for which the companies are accountable for rate-making purposes.

7. ———: **Profits on Investments: Loss on Business: Government and Other Bonds.** In determining whether the rates of fire insurance companies are reasonable, the court is not concerned about how much profit they make upon their investments (their capital and surplus); but where they insist that, notwithstanding the large aggregate of profits, their underwriting business results in serious loss, and that these profits occur notwithstanding such loss, it is proper for the court to take notice of the fact that the Government, State and municipal bonds in which the law requires them to invest their capital bear low rates of interest.

8. ———: **Profits: Unearned Premiums: Assets.** To ascertain the profit of the underwriting business in a test period of five years, the proper method is to take the premiums collected, earned and unearned, and subtract the losses and expenses paid. Unearned premium is what a company must repay when it cancels a policy. It is that portion of a premium which must be returned to the insured on the cancellation of the policy, and is in direct proportion to the unexpired time during which the policy is to run. It is the premium paid in advance for service to be thereafter rendered. Every premium on every accepted risk is unearned the moment the contract is consummated. The acquirement of unearned premiums is the purpose for which the entire underwriting business is conducted, and they are to be considered in estimating the underwriting profits. To ascertain the profits of the business in a test period, it would be illogical and unfair to take only the aggregate of earned premiums, and deduct therefrom all the losses and expenses incurred.

Held, by RAGLAND, J., dissenting, with whom BLAIR, C. J., concurs, that all assets of a stock fire insurance company, by whatever name designated, are its absolute property, and so long as it is a solvent going concern policyholders are not entitled to appropriate earnings arising from the investment of any part of the company's assets to the reduction of the cost of their insurance below a figure that will yield a reasonable underwriting profit; and "earnings on unearned premiums" (Sec. 6282, R. S. 1919) must be eliminated from consideration in arriving at a reasonable profit on the underwriting business in the State for the test period of five years, for interest on unearned premiums can no more be taken into consideration than the company's remaining assets. The unearned premiums, though paid in advance, are not to be regarded as money of the policyholders until earned by the lapse of time, and to apply them to a reduction of rates would be plain confiscation.

9. ———: ———: **Losses Prior to Test Period.** Losses occurring during the test period on policies written before the period began should be taken into account in an attempt to ascertain what was the net profit of the underwriting companies during the period.

10. ———: ———: **Insolvency Test.** In ascertaining the net profits of insurance companies during a test period, the insolvency test, which means that the premiums collected are to be valued at only what the company would realize on them in case it should cancel all the policies, is no test at all. The assets of a going concern are never of the same value as the same assets would possess in the case of a forced liquidation, and besides there is not a remote possibility that the companies would cancel their policies, since it is not to their interest to cancel them.

11. ———: ———: **Turning Profits into Losses.** Any method employed in arriving at the earnings of insurance companies during a test period which makes an asset a liability, turns a profit into a loss, shows a profitable business to be a losing business, and writes enormous gains for a long period off the books, cannot be correct on any principle, and is utterly in-

defensible. And it matters not that such method is shown by the weight of the evidence to be the correct one.

12. ————: ————: **Method Adopted by Companies.** Insurance companies cannot complain that the method employed by the State for ascertaining their profits on their underwriting business was to take the premiums actually received and subtract the losses and expenses paid during the test period, where they themselves approved the method and if it is faulty it is because their accounts afford no other way.

13. ————: ————: **Interest on Unearned Premiums.** In arriving at a reasonable profit to insurance companies during a test period arising from their underwriting business, interest on unearned premiums should be considered a part of the underwriting earnings; and especially so, where the amount of unearned premiums on hand during the five-year test period averaged twelve million dollars at all times, and the interest arising therefrom during the period exceed two million dollars. The amount of unearned premiums on hand is constantly increased by accretion and decreased by attrition, but is no part of the company's capital, surplus or investment fund; it is invested merely to safeguard and increase the premium reserve which is kept on hand to meet the payment of losses and expenses; it is used in the underwriting business, and the interest from its investment is a profit arising directly from that business as it accrues.

Held, by RAGLAND, J., dissenting, with whom BLAIR, C. J., concurs, that interest on unearned premiums cannot be taken into consideration in ascertaining underwriting profits. Profits must be determined on the basis of earned premiums. Until premiums are earned, they cannot be used by the insurer in striking a balance for the purpose of ascertaining his profits.

14. ————: ————: ————: **Statute.** The statute (Sec. 6281, R. S. 1919) requires each insurance company to report to the Superintendent of Insurance "the total amount of its earnings on unearned premiums," and was a legislative determination that interest on unearned premiums is an underwriting profit, to be taken into consideration by the Superintendent in an attempt to ascertain if the insurance rates are in excess of a reasonable profit on the underwriting business done in this State.

Held, by RAGLAND, J., dissenting, with whom BLAIR, C. J., concurs, that for many years it has been the universal custom and practice of stock fire insurance companies to compute their underwriting profits on the basis of earned premiums, and such is the basis for determining net income recognized by the income laws of America and England, and it is therefore entirely possible that our statute (Sec. 6282, R. S. 1919) in declaring that the earnings shall be determined from "the aggregate amount of . . . premiums, losses and expenses . . . and in addition thereto . . . earnings on unearned premiums" contemplates the same method of ascertaining underwriting earnings and profits.

15. ————: ————: **Effect of Prior Partial Increase on Reduction for Future.** The effect of an increase of insurance rates, made during the fourth year of the five-year test period and partially in effect for two years, is properly considered by the Superintendent of Insurance in making an order reducing the rates for the future, both because the effect of such increase, where that effect can be shown by exact figures, is not mere speculation, and because the statute (Sec. 6283, R. S. 1919) empowers him to "investigate the necessity for a reduction of rates" and if it appears therefrom that the earnings for the preceding five years have been "an aggregate profit in excess of what is reasonable" he "shall order such reduction of rates as shall be necessary to limit the aggregate collections by insurance companies in this State to not more than a reasonable profit." The statute does not

mean that he can reduce the rates only to the exact amount of the discovered excess; it means that "not more than a reasonable profit" is to be determined by the factors affecting the rates for the future as they exist when the reducing order is made. A war tax having been removed since the increase was made, he should consider its removal as a reduction in the future expenses of the underwriting business; if the prior increase is to continue to be effective, he should consider the increase as increasing the future income of the companies.

Held, by RAGLAND, J., dissenting, with whom BLAIR, C. J., concurs, that a previously ordered increase in rates which has not become effective at the time the reduction order is made, should not be taken into consideration in fixing future rates. The statute declares that if "it appears that the result of the earnings . . . for five years next preceding such investigation shows that there has been an aggregate profit . . . in excess of what is reasonable," etc., and in the face of this plain statute no. estimated earnings of a future period may be made the basis of an order reducing rates.

16. ———: ———: Expenses: Excessive Commissions: Excepted Cities: Excess to Brokers. Higher commissions paid to agents in excepted cities than in other parts of the State, the excess being due to the fact that brokers controlled the placing of insurance therein and they charged the agents a commission for placing the business with them, who recouped themselves by charging higher rates for the risks they wrote, cannot be justified by long-time custom, and the excess cannot be charged as a part of the expense of operation in considering whether the rates charged for underwriting business in the State result in unreasonable profit.

17. ———: ———: Income Tax: Net Loss. Where the insurance companies show a net loss on their business in this State, instead of a net income that could be taxed, an apportionment to this State of a large item of Federal income tax paid as an expense of operation should not be considered in an attempt to determine whether their rates are unreasonably high.

18. ———: ———: War Tax. The law imposing a war tax being no longer in force at the time the order reducing insurance rates was made, such tax should not be listed as an expense in fixing future rates.

Corpus Juris-Cyc. References: **Constitutional Law,** 12 C. J., Section 558, p. 974, n. 18; Section 727, p. 1067, n. 68; Section 782, p. 1088, n. 68. **Insurance,** 32 C. J., Section 13, p. 984, n. 57; p. 985, n. 65; Section 324 p. 1192, n. 2.

Appeal from Cole Circuit Court.—*Hon. Henry J. Westhues,* Judge.

REVERSED AND PROCEEDINGS DISMISSED.

*Floyd E. Jacobs* and *John T. Barker* for appellant.

(1) Fire insurance is a business affected with a public interest and it is well settled that a state may regulate fire insurance rates. Co. v. Wanberg, 260 U. S. 73; Co. v. Lewis, 223 U. S. 389; State ex rel. v. Harty, 278 Mo. 691; Co. v. Welch, 49 Okla. 620, 154 Pac. 48; Henderson v. McWaters, 104 S. C. 268; Martin v. Howard, 96 Neb. 278; People v. Co., 126 Ill. App. 636; 12 C. J., 850. (2) The reduction order is presumed to be just and reasonable and the burden

of proof is on the respondents to show the contrary; to overcome the presumption that the reduction order is reasonable the evidence must be clear and convincing, every reasonable doubt being yielded in favor of the reduction. Sec. 6284, R. S. 1919; Laws 1923, p. 235; 10 C. J., 426. (3) Respondents failed to meet the burden of proof imposed on them; they were required to offer substantial evidence as to their income, losses and reasonable expenditures; respondents refused to show what their expenses were or that they were reasonable and their officers were not allowed to testify as to what salaries and commissions they received; no proper explanation was given regarding excessive expenses; no such showing was made by respondents as to justify a court in setting aside the order of reduction and such order must be sustained. In re Water Co., 7 Mo. P. S. C. 379; In re Gas Co., 9 Mo. P. S. C. 465; Springfield v. Springfield, 10 Mo. P. S. C. 47; Re Railway Co., 11 Mo. P. S. C. 36; Re Railway Co., 11 Mo. P. S. C. 86; Re Railway Co., 7 Mo. P. S. C. 202; Re Railway Co., 11 Mo. P. S. C. 79; Re Water Co., 5 Mo. P. S. C. 620; Re Electric Co., 10 Mo. P. S. C. 335; State v. Express Co., 85 Neb. 25, 42 L. R. A. (N. S.) 396; Mo. Rate Cases, 230 U S. 474; Minn. Rate Cases, 230 U. S. 352; Ark. Rate Cases, 187 Fed. 290; State v. Co., 24 Nev. 53; Smythe v. Ames, 169 U. S. 466; Gas Co. v. New York, 157 Fed. 849; Darnell v. Edwards, 244 U. S. 564. (4) Only reasonable and prudent operating expenses can properly be charged against the State; excess profit taxes, surtaxes and other Federal taxes, excess commissions paid in St. Louis, taxes paid on property not devoted to the insurance business, donations, etc., are not operating expenses, but corporate expenses, and must be borne by the stockholders of the corporations. State v. Express Co., 85 Neb. 25, 42 L. R. A. (N. S.) 396; Mo. Rate Cases, 230 U. S. 474; Minn. Rate Cases, 230 U. S. 352; Ark. Rate Cases, 187 Fed. 290; State v. Co., 24 Nev. 53; Smith v. Ames, 169 U. S. 466; Darnell v. Edwards, 244 U. S. 564. (5) In arriving at the earnings of all the fire insurance companies doing business in Missouri all of their income from such business must be considered. Interest earnings constitute income and must be considered. Groesbeck v. Railroad, 250 U. S. 607; People v. Roberts, 52 N. Y. Supp. 859; St. John v. Railroad, 89 U. S. 136; State v. Co., 24 Nev. 53; Ark. Rate Cases. 187 Fed. 290, 230 U. S. 553; Fall River v. Com., 228 Mass. 575; Ark. Rate Cases, 168 Fed. 730. (6) For rate-making purposes the calculation of profit or loss of fire insurance companies can only be made upon the basis of premiums received, losses paid and expenses paid. Earned premiums, incurred losses and incurred expenses cannot be considered for rate making purposes. Secs. 6283, 6280, 6281, R. S. 1919. (7) Since the passage of the Rating Act

in 1915 the Insurance Department consistently interpreted the law to require a consideration only of written premiums, paid losses and paid expenses; the construction of executive officers entrusted with the duty of carrying out a statute is entitled to great weight. State ex rel. v. Gordon, 266 Mo. 394; State ex rel. v. Y. M. C. A., 259 Mo. 233; Folk v. St. Louis, 250 Mo. 116; Ewing v. County, 216 Mo. 681. (8) The evidence in this case conclusively shows that respondents have made more than a reasonable profit in Missouri during this five-year period, and the reduction order should stand. (9) All losses, including conflagration losses, were paid during this period with premiums received by respondents, and no allowance should be made for conflagration liability inasmuch as all losses have been paid and to make a further allowance would be a duplication.

*Bates, Hicks & Folonie, Hogsett & Boyle, Leahy, Saunders & Walther* and *Cockrill & Armistead* for respondents.

(1) Respondents sustained the burden of proof. The findings of fact by a referee sustained by the circuit court will not be disturbed unless the findings are palpably wrong, great deference being given to the findings of the referee and trial court. Hurst v. Trust Co., 264 S. W. 406; Rawlins v. Rawlins, 102 Mo. 563; Parker v. Roberts, 116 Mo. 567; Vanne v. Schencko, 100 Mo. 250; Lens v. Lenhardt, 127 Mo. 271; Laughlin v. Laughlin, 291 Mo. 472. (2) Under the Rating Act of 1915, the Superintendent has no power to pass on the reasonableness of expenses. The only power given to the Superintendent is by Sec. 6283, R. S. 1919, authorizing him to investigate the necessity for a reduction of rates, and under proper circumstances to make a reduction order. He is given no power to pass on the reasonableness of respondents' expenditures. A grant of authority to administer legislative power will be held to extend no further than the express terms of the grant. State ex rel. v. Patterson, 229 Mo. 391; Syler v. Railway Co., 213 U. S. 175; Interstate Commerce Commission v. Railroad Co., 167 U. S. 479; City of Benwood v. Commission, 75 W. Va. 127; Railroad Co. v. Railroad Commissioners, 94 Miss. 124; Railroad Commissioners v. Oregon Railroad Co., 17 Ore. 19, 19 Pac. 702; Grand Rapids Co. v. Railway Commissioners, 183 Mich. 383; 150 N. W. 155. (3) There are no improper or excessive expenses including in respondents' tabulations of experience. (a) Excess commissions in St. Louis are expenses which the respondents are compelled by conditions to pay. (b) Federal taxes are properly treated as operating expenses. Galveston Electric Co. v. Galveston, 258 U. S. 399; Georgia Railway & Power Co. v. Railroad Commission, 43 Sup. Ct. Rep. 682; Oklahoma Natural Gas Co. v. Corporation Commission, 90 Okla. 84, 216 Pac. 217; Municipal Gas Co. v. Public

Service Corporation, 186 N. Y. Supp. 541; Consolidated Gas Co. v. Newton, 207 Fed. 231, note in 23 A. L. R. 826. (c) There are no expenses for donations or entertainments included in respondents' figures. (d) Taxes on property not devoted to the insurance business are excluded from respondents' figures. (e) Commissions to brokers are not paid by respondents, and are therefore not included in respondents' expense figures. (f) Legal expenses incurred by respondents are properly included. Arkansas Rate Cases, 187 Fed. 315. As to all expenses included in respondents' tabulations, the presumption is, in the absence of any testimony to the contrary, that they were reasonably incurred and that the amounts thereof are reasonable. Dayton Goose Creek Railway Co. v. United States, 44 Sup. Ct. Rep. 169. (4) Interest earnings on the capital and surplus of the companies cannot be taken into account in fixing a level of rates for underwriting. (a) The undisputed evidence shows a clear line of separation between the underwriting and investment activities of the insurance companies, each of which activities is productive of a profit or a loss. The Income Tax Law of Congress recognizes the clear line of separation between the two activities, by imposing taxes calculated in different ways upon investment profit and underwriting profit respectively. Revenue Act 1921, sec. 246a; Revenue Act 1924, sec. 6336. (b) The reduction order, in so far as it takes into account interest earnings on capital and surplus in order to reduce underwriting rates, deprives the companies of their property without due process of law. Smyth v. Ames, 169 U. S. 540; Minnesota Rate Case, 230 U. S. 352; State ex rel. Case v. Public Service Commission, 249 S. W. 962; Marty v. Light & Power Co., 259 S. W. 796; Hackworth v. Railroad Co., 286 Mo. 282; Northern Pacific Railway Co. v. North Dakota, 236 U. S. 585; Brooks-Scanlon Co. v. Railroad Commission, 251 U. S. 596; Vandalia Railroad Co. v. Schull, 255 U. S. 113; Norfolk & Western Railroad Co. v. Conley, 236 U. S. 605; Interstate Commerce Commission v. Union Pacific Co., 222 U. S. 541; Union Pacific Railroad Co. v. Public Utilities Commission, 95 Kan. 604; Morgan Co. v. Railroad Commission, 127 La. 636; Louisiana Co. v. Railroad Commission, 131 La. 387; State v. Spokane Railroad Co., 89 Wash. 599; State Public Utilities Commission v. Monarch Refrigerating Co., 267 Ill. 528; Citizens Railway v. Public Service Commission, 271 Pa. St. 39; State ex rel. Danciger v. Public Service Commission, 275 Mo. 496; Nowata County Gas Co. v. Henty Oil Co., 269 Fed. 742; State ex rel. Kansas City v. O'Rear, 210 S. W. 392; Note in 52 L. R. A. (N. S.) 15; 10 C. J. 423; Railway Co. v. Railroad Commission, 155 Fed. 806; In re Arkansas Railroad Rates, 163 Fed. 143; Northern Ry. Co. v. Keyes, 91 Fed. 48; Chicago Railroad Co. v. Dey, 35 Fed. 866; Railway Co. v. Towers, 126 Md. 59; State v. Express Co., 81 Minn. 87, 83 Am. St. 366, 50 L. R. A.

667; Railway Co. v. Railroad Commissioners, 196 Fed. 800; Railway Co. v. Hadley, 168 Fed. 317 (modified in 230 U. S. 474); Cumberland Telephone & Telegraph Co. v. La. Public Service Commission, 285 Fed. 215. (c) The Missouri Rating Act does not contemplate taking into account interest earnings on capital and surplus. Section 6283 confines the superintendent to "earnings in this State," and to "the aggregate profits therein," and to "the aggregate collections by insurance companies in this State;" whereas the undisputed evidence shows that none of the interest earnings from capital and surplus are "earned in this State" or "collected in this State." This conclusion is made positive by consideration of other provisions of the Rating Act of 1915. Secs. 6280, 6281, 6282, R. S. 1919. To so construe Section 6283 as to apply interest earnings from capital and surplus to a reduction of underwriting rates, would be to render such section unconstitutional and void. Authorities supra. Where a statute is reasonably susceptible of two constructions, one of which will render it unconstitutional, and the other will leave it valid, the court will adopt the latter interpretation. Stack v. General Baking Co., 283 Mo. 396; State ex rel. Marquette v. State Tax Commission, 282 Mo. 213; Weisberg v.| Boatmen's Bank, 280 Mo. 199; State ex rel. Columbia Telephone Co. v. Atkinson, 271 Mo. 28. The fact that the Legislature in 1923 saw fit to amend the 1915 Rating Act by providing that the superintendent shall take into consideration investment profits, is conclusive that the legislative intent was that the Act of 1915 did not authorize him to take into account investment profits. Laws 1923, p. 234; 25 R. C. L. 1064; 36 Cyc. 1142, 1165; 26 Am. & Eng. Encyc. Law, 624-637; Crohn v. Kansas City, 109 S. W. 1068; Pike v. Megcun, 44 Mo. 491; Reed v. Goldneck, 112 Mo. App. 313; Sikes v. Railroad, 127 Mo. App. 326; State ex rel. v. Wilson, 151 Mo. App. 728. (d) Appellant's argument that it is unfair to exclude investment profit and to include investment expenses, is fully met by the fact that plaintiffs have taken investment expenses out of their tabulations of underwriting profit. (5) Interest earnings on unearned premiums on Missouri business should not be considered in calculating profit or loss for the purpose of a reduction of rates. Section 6281 and 6282 requiring the companies to report their earnings on unearned premiums are intended only to inform the Superintendent as to the qualifications of the companies to do business in the State. The unearned premium reserve belongs to the company and not to the policyholders. People ex rel. v. Westchester Fire Ins. Co., 91 N. Y. 574; State ex rel. v. Parker, 34 N. J. L. 479; Mutual Benefit Co. v. Duffy, 295 Fed. 881; Ins. Co. v. Capellar, 38 Ohio St. 560; Equitable Life v. Board, 74 Iowa, 172; Kenton Ins. Co. v. Covington, 86 Ky. 213; Payne v. Ins. Co., 195 Mo. App. 512; Trenton v. Standard Fire Ins. Co., 77 N.

J. L. 757; Maryland Gas Co. v. United States, 251 U. S. 348; Equitable Life v. Brown, 213 U. S. 25; Grief v. Eq. Life, 106 N. Y. 19; City v. Ins. Co., 179 Mich. 244. (6) The only proper method of arriving at the underwriting profit of insurance companies is upon the basis of premiums earned less losses and expenses incurred during the five-year period. (a) The overwhelming weight of the evidence sustains this proposition. Each of the forty-eight states in the Union, including Missouri, requires an annual statement of underwriting experience upon the earned and incurred basis; and if this is a proper method to determine solvency, it is necessarily the proper method to determine whether profits have been made. Bullion v. Aetna Ins. Co., 151 Ark. 519. The National Convention of Insurance Commissioners have held that underwriting profit is ascertained by deducting from earned premiums all incurred losses and incurred expenses. The Congress of the United States has defined underwriting income to mean premiums earned less losses and expenses incurred. Revenue Act 1921, sec. 246a; Revenue Act 1924, sec. 6336. (b) The Missouri statutes contemplate the use of the earned and incurred method. The companies are by statute required out of every premium collected to set up an unearned premium reserve. Sec. 6222, R. S. 1919. The companies are forbidden to pay dividends except from surplus profits, and surplus profits are arrived at by offsetting against assets various liabilities, including unearned premiums. Sec. 6333, R. S. 1919. In an investigation under the rating statute the important question to be ascertained is, what was the amount of the "earnings" in this State for the period. Sec. 6283, R. S. 1919. That portion of the premium which the statute says must be set up as a reserve, and which the company is forbidden to pay out as a dividend, cannot with reason be classed as an "earning;" it is a contradiction in terms to call the unearned portion of the premium an "earning." (c) Unearned premiums cannot legally be used in payment of dividends of an insurance company. Bullion v. Aetna Ins. Co., 237 S. W. 718; 2 Cook on Corporations (7 Ed.) sec. 546, p. 1609; 6 Fletcher Encl. on Corporations, 6104; Insurance Co. v. Page & Richardson, 17 B. Mon. 412; Hope Mutual Life Ins. Co. v. Perkins, 4 Rob. (N. Y.) 182. Unearned premiums of an insurance company are not profits. In re Continental Casualty Co., 179 N. W. 185; Scott v. Eagle Fire Co., 7 Paige (N. Y.) 198; DePeyster v. American Fire Ins Co., 6 Paige (N. Y.) 486; Hope Mutual Life Ins. Co. v. Perkins, 4 Rob. (N. Y.) 182. (d) Words in a statute which have a peculiar and appropriate meaning shall be construed according to such meaning. Sec. 7058, R. S. 1919; Dworkin v. Caledonian Ins. Co., 285 Mo. 361; Patchin v. Bousack, 52 Mo. 433; Ex parte Bethurum, 66 Mo. 548; Wilson v. County, 132 Mo. 387; State v. Clipper, 142 Mo. 474. (7) The estimated future effect of the increase of Jan-

uary, 1920, is not to be taken into consideration in arriving at the experience of the five-year test period. The Rating Act expressly limits the inquiry to the experience of the "five years next preceding such investigation," and this statutory test period is exclusive. Sec-6283, R. S. 1919.

WHITE, J.—The defendant, Superintendent of the Insurance Department of the State of Missouri, on October 9, 1922, promulgated under Section 6283, Revised Statutes 1919, an order reducing certain insurance rates in the State ten per cent. One hundred and sixty stock fire insurance companies doing business in the State filed their petition in this case November 10, 1922, in the Circuit Court of Cole County, praying the court to review the findings and order of the commissioner and set it aside.

The order made by the Superintendent recites that a similar reduction order was made in January, 1922. It was followed by an injunction suit filed by certain insurance companies. This order was later set aside, the injunction suit dismissed, and a stipulation entered into between insurance companies and the Superintendent which provided for the production before the Superintendent of such evidence as he might require and such as the companies might see fit to bring bearing upon the question of reduction. The order recites further that, notwithstanding his request, the insurance companies refused to furnish the information agreed upon. The order, so much as is important for our purpose, then proceeds as follows:

"I have made a full and complete investigation, as provided for by law, of the underwriting experience of the stock companies referred to with respect to the business transacted by them in the State of Missouri during the years 1917, 1918, 1919, 1920 and 1921. Such investigation is based upon the sworn statements filed with the Insurance Department during said years by said companies as required by law and from such other information as has been available. Such investigation shows that the aggregate profits of said companies upon their Missouri business during said period is in excess of what is reasonable.

"During said five years, said stock companies collected on Missouri business net premiums amounting to $81,067, 318.

"During the same period the interest on the capital and surplus of said companies, prorated to Missouri, amounted to $2,801,660, and during the same period the interest on unearned premium reserves, on Missouri business, amounted to $2,418,596. This means a total income on Missouri business during said five year period of $86,-287,574.

"During the same period these companies paid losses in Missouri, $45,066,124. It is the opinion of this department that these losses

were unnecessarily large because of over-insurance and lack of adequate inspection.

"This makes a difference of $41,221,450 between the total amount collected and the amount paid in losses. This item, $41,221,450, represents the amount left for profits and expenses, as shown by the reports of the companies, and is 47.77 per cent of the total income as reported. The above amount, $41,221,450, is made up of expenses, $32,534,617, and, profits, $8,686,833, according to the reports of the companies. I find that this expense item is excessive, and that a proper and reasonably economical administration of the business will result in greatly increased profits even under lower premium rates. In other words, there is a large potential or unrevealed profit in the excessive expenses.

"I find that these excessive expenses are largely the result of the following causes: 1. Certain excessive and discriminating commissions paid. 2. Expenses of marine and inland business unjustly and illegally apportioned to Missouri. 3. Unfair and improper allocation of over-head expenses. 4. Improper charge of income and excess profit taxes. These items amount in the aggregate to not less than $5,000,000. It is my opinion and I find that a per centage of 47.77 per cent for profits and expenses is unreasonable and excessive. It is my duty, therefore, to make such order as the law permits me to make; that is, a reduction of rate, leaving it to the companies to adjust the expenses accordingly and to reduce the losses through proper inspection and the elimination of over-insurance.

"An additional reason for reduction in rate at this time arises from the fact that an increase in rate authorized in January, 1920, had not at the close of 1921 been fully applied. The full application of this increase which, unless modified, will be the authorized rate, will result during 1922 and the years following in an increase of the premiums now charged of approximately eight per cent.

"Therefore, I find that the present rates are excessive and that they produce as hereinbefore stated profits to the companies in excess of what is reasonable, and I further find that a reduction of ten per cent in the present rates will result in profits that are reasonable. Accordingly you and each of you are hereby notified that I have this day ordered a reduction of ten per cent in the rates now charged by the aforesaid companies on fire, lightning, hail and windstorm insurance business written in the State of Missouri, which reduction, in my judgment, will still leave said companies a reasonable profit after giving proper and reasonable consideration to the conflagration liability both within and without the State.

"The aforesaid reduction order shall take effect and be in operation on and after the 15th day of November, 1922, and shall be applied subject to the approval of the Superintendent of Insurance.

If the companies do not within thirty days from this order of reduction submit a class or classes which meets the approval of the Superintendent of Insurance, the Superintendent will designate the class or classes to which the reduction shall apply.

"BEN C. HYDE,
"Superintendent of Insurance."

At the outset, counsel for plaintiffs and defendant disagreed as to the scope of the inquiry before the trial court. Counsel for defendant contended that the court was limited to the facts before the Superintendent upon which he made the order, under the language of Section 6284, Revised Statutes 1919, which provides that the order of the Superintendent "shall be reviewable" by proper action in the circuit court. Whereas, the plaintiffs' counsel maintained that the language following that just quoted, "and upon such review the entire matter shall be treated and determined *de novo*" required the circuit court to try the case and introduce any evidence that might be pertinent to the inquiry, regardless of what facts were before the Superintendent, inducing his action in making the order.

On a stipulation of the parties the case was referred and Honorable John I. Williamson was appointed referee. He held that the case was triable *de novo* in accordance with the theory advanced by the plaintiffs, and took voluminous evidence in Chicago, New York and Missouri, to ascertain whether, during the five-year test period under examination, 1917 to 1921, the insurance companies doing business in the State of Missouri, affected by the order, made more than a reasonable profit. The plaintiffs claimed that during the test of the five-year period, 1917 to 1921 inclusive, the insurance companies in their underwriting business in the State of Missouri suffered a large loss. The referee, after several months of investigation, determined all the essential facts in favor of the plaintiffs and against the defendant, the Superintendent. The trial court approved the findings of the referee and entered judgment on December 22, 1924, canceling the order made by the Superintendent. From that judgment he appealed. The effect of the statute under which the Superintendent acted and the court reviewed his order, will be considered more fully below.

It was demonstrated that the reports upon which the Superintendent of Insurance reached his conclusion and ordered the reduction, were incorrect in many respects, although those reports were sworn to by the several companies and filed, as the statute required, in his department, for the purpose of furnishing him the information upon which he might act in such case. Errors were pointed out in the reported premiums and expenses; duplications were shown; on the whole the reports were shown to be entirely untrustworthy.

It must be noted that the defendant in this case was entirely dependent upon the information furnished by the plaintiffs. They made their own figures, explained their methods of bookkeeping on their own theories, and furnished the facts to the referee according to their theory of what the facts showed.

The claim of the plaintiffs is based upon their summary and conclusion from the figures produced of the underwriting business done in Missouri during the years 1917 to 1921 as follows:

| | | |
|---|---|---|
| Earned Premiums | | $74,813,816 |
| Incurred Losses | $48,593,664 | |
| Incurred Expenses | 33,230,352 | |
| Incurred losses and expenses combined | | 81,824,016 |
| Underwriting loss (9 % of earned premiums) | | $ 7,010,200 |

The defendant's claim is as follows:

| | | |
|---|---|---|
| Premiums five years, 1917-1921 | | $83,502,181 |
| Add amount of increase of 1920 | | 7,693,045 |
| Total premiums including increase | | $91,195,226 |
| Interest on unearned premium | $2,301,132 | |
| Interest on capital and surplus | 1,914,940 | |
| Total investment profit | | 4,216,072 |
| Total receipts | | $95,411,298 |
| Losses and expenses reported | $80,161,057 | |
| Deduct excess commissions paid in St. Louis | $2,496,715 | |
| Deduct Federal taxes | 1,171,119 | 3,667,834 |
| Actual losses and expenses | | 76,493,223 |
| Net profit | | $18,918,075 |
| Deduct amount of reduction 8.6% of premiums of $91,195,226 | | 7,842,789 |
| Net profit after reduction of 10% | | $11,075,286 |

The premiums in the first item mean *collected* premiums, as distinguished from *earned* premiums, mentioned in plaintiffs' tabulation.

The increase of $7,693,045 refers to what the additional earnings would have been if the order of 1920 increasing the rates fifteen per cent had been in full effect during the five years. That increase is mentioned in the reduction order as one reason for making the reduction complained of.

Thus, it is the plaintiffs' claim, taking them all together, that they lost more than seven million dollars in the underwriting business in

Missouri during the five-year-test period, while the defendant's figures show they gained a very large net profit and, taking into consideration a previous increase of rates in 1920, the profit would have been more than eleven million dollars if the reduction and the increase had been in full effect. These differences do not arise from different figures and tabulations. There seems to be no dispute as to specific facts. The contest arises upon a different interpretation by the respective parties of the facts produced. The items of the respective accounts set out above illustrate their different theories. The facts and figures all come from the plaintiffs.

I.    The statutes under which the Superintendent acted and the circuit court reviewed the action, Sections 6283 and 6284, Revised **Applicable** Statutes 1919, appear in the Rating Act of 1915, which **Statutes.** was agreed upon, it is said, by the insurance companies and the State Insurance Department and enacted for the purpose of relieving the companies from the embarrassment of the anti-trust laws. Those sections are as follows:

"Sec. 6283. *Superintendent to investigate the reasonableness of rates—authority to order reductions.*—The superintendent of insurance, upon written complaint of any citizen, or upon his own motion, is hereby empowered to investigate the necessity for a reduction of rates, and if, upon such investigation, it appears that the result of the earnings in this State of the stock fire insurance companies for five years next preceding such investigation shows there has been an aggregate profit therein in excess of what is reasonable, he shall order such reduction of rates as shall be necessary to limit .the aggregate collections by insurance companies in this State to not more than a reasonable profit. Any reduction ordered by the superintendent of insurance shall be applied, subject to his approval; *Provided,* that the superintendent of insurance shall designate the class or classes to which the reduction shall be applied if the companies do not, within thirty days from the order of reduction, submit a class or classes which meet his approval. In determining the question of rates and profits in accordance with this article, the superintendent of insurance shall give proper and reasonable consideration to the conflagration liability, both within and without the State.

"Sec. 6284. *Order of superintendent reviewable by court action.—* The orders and directions of the superintendent of insurance, together with his findings or determinations of facts upon which such order or determination is founded, shall be reviewable by a proper action in the courts, and upon such review the entire matter shall be treated and determined *de novo*, but the burden of proof as to the unreasonableness or the injustice of any order made by the superintendent of in-

surance shall rest upon the party or company appealing from any such order. During the pendency of such action or review each insurance company or other insurer shall not charge any rate or premium in excess of that fixed by the superintendent of insurance.''

In 1923 the Legislature amended those sections. The essential part of the amendment to Section 6283 is as follows: ''He shall order such reduction of rates as will, in his opinion, produce a fair and reasonable profit only. He shall also take into consideration the acquisition cost and administration expense of such companies, and all earnings of such companies, including investment profits. He shall also consider whether or not the underwriting activities of such companies are conducted on a reasonably economical basis, and whether or not their investments have been and are being made in a safe and reasonable manner, it being the intention of this section to provide that policyholders shall not be charged rates which will cover losses occasioned by extravagant methods or unsafe or speculative investment of funds.''

The essential part of the amendment to Section 6284 is as follows: ''The court shall have authority to sustain, set aside or modify the orders and directions under review.''

The plaintiffs contend that the Act of 1923 is not applicable to this case because the act went into effect in June, 1923, long after the order of the Superintendent was made. The referee held that those provisions in the Act of 1923 set out above only related to the remedy, did not affect any vested right, and therefore were applicable to the case in hand.

No doubt the referee was right in his statement of the law. A new enactment which only affected the remedy, has no effect upon vested rights, does not impair the obligation of contracts and may control in the decision of a case. [Gladney v. Sydnor, 172 Mo. 1. c. 324; Clark v. Railroad, 219 Mo. 1. c. 533.] Such an act does not offend against the constitutional restriction that no law retrospective in its operation can be passed by the General Assembly. [Sec. 15, Art. II, Mo. Const.] But the referee apparently overlooked the fact that the act did not go into effect until June, 1923, nearly a year after the reduction order was made; the Superintendent of Insurance could only consider such facts and make such determinations as the law then in effect allowed him. The trial court under Section 6284 was authorized to review the order ''and upon such review the entire matter shall be treated and determined *de novo.''* That cannot be construed to mean that the trial court could make a new order in lieu of the one made by the Superintendent. It was limited to a review of the order made, and to such evidence as might have been produced before the superintendent. It must determine the case upon the facts as they existed then.

The provision quoted above, amending Section 6284, "the court shall have authority to sustain, set aside and modify the orders and directions under review," does not relate to the action of the Superintendent, but the action of the trial court reviewing it. The Act of 1923 was in effect when the evidence was taken and when the judgment was rendered in the trial court.

The referee was correct in holding that the trial court was not limited to an investigation of the facts which the Superintendent had before him, but could take into consideration any evidence produced by either party which would throw light upon the propriety of the order at the time it was made.

II. The statute, Section 6283, requires the Superintendent to order a reduction so as to limit the aggregate collections of the insurance companies "to not more than a reasonable profit." A rea-

**Reasonable Profit.** sonable profit, it seems to be agreed, is five per cent on the underwriting business done, with three per cent additional for conflagration hazard., The difference between the state and the plaintiffs arises in the method of ascertaining the amount of the profit realized on the business. In that respect they differ radically on a number of items, which appear on the respective claims noted above, and which will be considered in their order.

The plaintiffs assure us that the insurance companies preserve a clear line of separation between their underwriting activities and the investment activities; that their returns and profits from their investments should not be considered as profits for rate-making purposes, but the only thing to be considered is the underwriting business done and the profits arising from that. The law relating to public service corporations contains features unlike anything in the rating act for insurance companies. The public service corporations are regulated in a way to insure them a reasonable return on their capital invested after defraying expenses. Often they are monopolies having no substantial competition. Insurance companies always have active competition among each other. The Rating Act was intended to remove the temptation to pool in violation of the anti-trust laws and to prevent ruinous competition. The statute contemplates that the rates shall be fixed with a view of the aggregate earnings and profits for the insurance business in the State. Each company may make as much money as it can. Some may make enormous profits, some may do a losing business, but the average profit, that is, the aggregate profit on the aggregate business, must be reasonable. That seems to be sufficient reason for taking the business done and not the capital invested, as a basis for measuring a reasonable profit.

The plaintiffs claim that the expenses incurred in the State do not.include expenses of their investment business, but only expenses actually incurred in the underwriting business. That is not true, because the items of investment profit mentioned in defendant's tabulation above are the *net* earnings after the expenses are paid. It is exactly the same as if the total investment earnings were stated and the expense subtracted. But they ask for no return from the underwriting business on their investment funds. Therefore we do not allow defendant's claim of $1,914,940 profit on capital and surplus, as a part of the Missouri profits for rate-making purposes.

The evidence showed that the companies made enormous profits during the period under investigation and paid large dividends. We cannot avoid noting that the Government, state and municipal bonds and other safe securities in which the law requires insurance companies doing business in the State to invest their capital, bear low rates of interest. They are the safest, though the least remunerative, methods of investment. Yet the plaintiffs insist that, notwithsanding the large aggregate profits of the companies, their underwriting business results in a serious loss, and these profits occur notwithstanding such loss. They claim that the large profits are due to the investment branch of the business. We are inclined to think that the conclusion thus reached is a triumph of bookkeeping skill rather than a scientific elucidation of the actual facts.

Of course we are not concerned about how much profit the plaintiffs make on their investments, but the figures given below are important in determining their underwriting profits. A large number of exhibits with a great mass of figures are in evidence, A few of these may assist in understanding the discussion of the items to follow.

The capital apportioned to Missouri during the five-year period of $17,816,887, and the surplus was $36,842,320, a total of $54,659,107. The investment profit on this was $1,914,940 as stated. These figures show the added capital and surplus for the five years, and the profit for that time. To obtain the average sum in actual use and the returns on it, those totals must be divided by five. The total profit is the same as would be realized on the total investment for the year. It figures about three and a half per cent per annum. We are not to suppose that the companies made a larger profit on their general investment business; the above sums were *apportioned* to Missouri, on the State's percentage of the general business, investments and profits in the same proportion. Some of the exhibits show the character of their investments, stocks, bonds, real estate loans and the like. None of them indicate speculative risks on which large returns might be expected, to account for large profits. So far as Missouri is concerned the plaintiffs show a great loss for five years,

315 Mo.—9.

taking into consideration all their business, investment and underwriting. We are not pointed to any evidence where this loss was made up in other states, by higher insurance rates than were paid here. There *was* evidence of enormous conflagration losses, prior to the test period, 1917-1921. How can we account for the extraordinary profits?

Taking all the business everywhere of *all* the companies for the five years, we have:

Total capital ................................$ 615,630,115
Total contributed surplus .....................   14,155,423
Capital and contributed surplus ...............  629,685,538
Total earned surplus ......................... 1,258,329,906

Grand total ................................$1,888,015,444

Thus it will be seen that the contributed surplus, the surplus paid in by the stockholders, was insignificant, while the *earned surplus* was more than double all sums paid in by stockholders, both capital and contributed surplus. So the insurance companies must have been quite prosperous *before* the test period began, notwithstanding conflagration losses. At the low rate of investment earnings, it would take a long time for the money paid in to increase that much. We have not consulted interest tables, but no doubt taking account of periods when funds must be idle, thirty or forty years must elapse before a sum invested at three and a half per cent, compounded, can triple itself; even if no dividends were paid from the increase. It is incredible that the large profits could come from investments.

The above figures are cumulative. To get the average for five years they must be divided by five.

The capital and contributed surplus in 1917 was $109,813,161, and in 1921 it was $149,003,201, while the average for the five years was $125,937,107.

In 1921 the earned surplus was .................$293,845,008
In 1917 it was .............................. 197,903,541
Gain in five years .........................$ 95,941,467

Thus while the large earned surplus showed prosperity before 1917, it showed equal prosperity during the five-year period by adding $95,941,467 to the investment funds. During the five years the companies paid $110,142,849 in dividends.

Thus the gain was, earned surplus ..............$ 95,941,467
Dividends ................................ 110,142,849

Total ...................... ............$206,084,316

Divide that sum by five and we have $41,216,863, the average annual net profit.

The total capital and contributed surplus during the period was $629,685,538, with an annual average of $125,937,107. So the profit was nearly thirty per cent on that. Add the earned surplus and the whole investment sum available during the period was $1,888,015,444. Divided by five, $377,603,088, the average for the five years. The average increase of $41,216,863 was approximately eleven per cent per annum. This accounts for the ability of the companies to pay large dividends on the money actually invested and at the same time annually lay up a surplus to augment their investment funds.

The total capital and surplus in 1921 was $442,848,209; in 1917, $307,716,702, an increase of $135,131,507. Of this about $40,000,000, as noted above was increased capital, probably due to the formation of new companies, whose capital did not earn much at first. The greater part of the new capital was added in the last two years. So that the total earnings appearing in dividends and earned surplus, $206,084,316, as shown above, was almost wholly from the $307,716,-705 on hand in 1917, approximately sixty-seven per cent or about twelve and a half per cent per annum.

While a large part of this profit must have come from the underwriting side of the business, it does not tell the whole story and does not account for all the profits. We find it difficult to reconcile that moderately large profit with the following figures.

The total underwriting profit of all the companies during the five years was $409,944,558. The investment profit was $138,253,522. Total, $548,198,080.

As shown above, the cumulative capital and surplus for the five years was $1,888,015,444, an average of $377,603,089 a year, of which the contributed capital and surplus averaged $125,937,107. Thus the earnings for the five years was nearly four and a half times the money originally invested by the stockholders, and nearly one and a half times, or one hundred and fifty per cent, of the capital, paid surplus and earned surplus, combined. This is more than eighty per cent per annum on the original investment, and 29.03 per cent per annum on the investment and accumulated earned surplus. Of this 29.03 per cent, 7.32 per cent was due to investment earnings and 21.71 per cent was due to underwriting earnings, as shown by the tabulations in the exhibits. Thus about three-fourths of all the earnings of the plaintiffs were underwriting earnings.

Was any business ever so generally prosperous? The plaintiffs, by this showing, every five years can quadruple their original investment, or double their total accumulations, and at the same time pay as dividends ten per cent per annum. Three-fourths of this is due to the underwriting business, *as they count it*, notwithstanding the enormous losses in that branch of the business in Missouri. Yet as we will show, more than half of the stated investment earnings are

directly due to the underwriting business. Are we to believe that rates are so much higher in other states than here, nothwithstanding many of them have rating acts, that this enormous profit can thus be accounted for? The evidence does not show any such condition. On the contrary, by the method of ascertaining profits and losses, which the respondents seek to apply to this case, the companies *during the last twenty years have made an underwriting profit of less than one per cent*. This in the teeth of the undisputed figures that the underwriting profit has resulted in the enormous gains shown above. Thus the, to us, unexplored mysteries of bookkeeping present the problems to be solved.

It may be noted that the income on the capital and surplus is 7.32 per cent per annum, about double the 3½ per cent profit on those items in Missouri. In fact, *the total invested funds are more than double the capital and surplus to invest*. The bonds, stocks, loans, etc., for the period were $4,156,861,763, while the total capital and surplus was $1,888,015,444 or a little over 45 per cent of the total. We account for that in this way: There is always on hand a large sum in unearned premiums. It averages more than all the capital and surplus combined and is invested in the same safe way that the capital is invested. The companies keep invested, bearing interest all the time, five or six times as much money as their stockholders ever paid in as capital and surplus. This is illustrated in that part allocated to Missouri, as shown in defendant's claim above:

Interest on unearned premium ....................$2,301,132
Interest on capital and surplus ................. 1,914,940

Total investment earnings ....................$4,216,072

Thus the unearned premiums amount to more and earn more profit than all the invested capital and surplus. In truth they occupy so large a space in the argument and are so important in determining what are underwriting profits, that we must next consider the respective claims in regard to them.

III. The difference in method appears in consideration of the premiums. The plaintiffs insist that *unearned* premiums shall not be considered at all in estimating the underwriting profits, that

**Unearned Premiums.** the way to estimate the profits which accrued during the test period is to take the *earned* premiums and deduct the losses and expenses incurred. The State insists that the proper method is to take the premiums collected and subtract the losses and expenses *paid* in order to ascertain the profit. This necessitates an inquiry as to what unearned premiums *are* and their effect.

Unearned premium is that portion of a premium paid which must be returned to the insured on the cancellation of the policy and is

in direct proportion to the unexpired time during which the policy
is to run. They are paid in advance for service to be thereafter ren-
dered. That is, it is what a company must repay when it cancels a
policy. As we understand it, it is not the short-rate payment which
the insured receives when he desires to cancel the policy. The funda-
mental error of the plaintiffs' method appears in several ways. Judge
RAGLAND has written so clearly on that subject that we quote from
his opinion as follows:

"As heretofore stated it is the contention of the companies that
the earnings of a given period on which underwriting profit can be
predicated are determined by deducting from the premiums earned
during that time the losses and expenses incurred. The method em-
ployed for ascertaining the amount of premiums earned is this: Add
the unearned premiums at the beginning of the period to the aggre-
gate net premiums received during that time and deduct from the
sum the premiums unearned at the end of the period. Incurred losses
and expenses are arrived at in this way: Subtract the outstanding
incurred losses and expenses at the beginning of the period from the
losses and expenses paid during that time and then add the losses
and expenses unpaid and outstanding at the end of that period.
According to the method of determining earnings just outlined re-
spondents lost during the period in question in their underwriting
business $7,010,200. During the entire period their business was
steadily expanding, the rate of increase being pronounced. As a
consequence the figure indicating unearned premium at the end of
the period was much larger than the one representing unearned pre-
mium at the beginning. Had those figures been transposed, that is,
if the larger one had represented the unearned premiums at the be-
ginning of the period and the smaller one the unearned premiums at
its close, according to the method of computing earnings just de-
scribed the companies would have had an underwriting profit of
more than $9,000,000. To express it differently: when the companies
are prosperous and increasing the volume of their business, accord-
ing to this method of computing earnings, they are losing money;
when their underwriting is falling off they are piling up profit. It
should not be forgotten that 'unearned premium' is but an arbitrary
measure of contingent liability. Such liability while it necessarily
increases with an expanding business is by no means a true exponent
of underwriting earnings. An insurance accountant of many years ex-
perience, testifying for respondents, stated that while the fire in-
surance business had been rapidly increasing in volume during the
last twenty years, the companies according to the method of com-
puting earnings which they now invoke had during the whole of that
time made an underwriting profit of less than one per cent. It was
the witness' *theory* that the huge surpluses which they have man-

aged to accumulate during that time resulted from investment earnings, but it is unbelievable that corporations so organized for profit would have continued for such length of time to hazard their capital in the business of underwriting if that business in fact yielded no profit. The method of determining profit which respondents seek to have applied is clearly unsound.

"In their bookkeeping the companies at the close of each year strike what their accountants term a trade balance. This balance is derived by deducting from the aggregate net premiums received during the year the total losses and expenses paid during that time. The net premiums consist of all premiums received less the pro-rata returned upon cancellation and sums paid for reinsurance. When a loss occurs an estimate of the amount is entered upon the books as an 'incurred loss.' When the loss is subsequently adjusted it is paid. The amount paid is frequently reduced by salvage or recoverable reinsurance. But losses regardless of when they occurred are paid out of current premium receipts. The distinction between incurred expenses and paid expenses is negligible. All expenses with the exception of taxes are ordinarily paid within the year in which they are incurred.

"The annual trade balance of a company engaged in a continuing business, being the difference between its receipts on the one hand and its expenditures on the other, during the preceding year, must necessarily reflect with a fair degree of accuracy its earnings for that period. To be sure such balance would not be indicative of solvency as heretofore defined, nor would it properly represent net earnings if the distribution of assets upon dissolution were involved, but nevertheless it cannot be gainsaid that it does in fact constitute the clear earnings of the period embraced, if that period be considered a part from those which preceded it and those which follow, as is the case where a basis for rate regulation under the statute is sought.

"Based on the conclusions reached in the preceding paragraphs we are of the opinion that the 'aggregate amount of . . . premiums losses and expenses for or on account of business within this State . . . for . . . five years next preceding' intended by the Legislature were the aggregate net premiums received and the losses and expenses paid during the five-year period. That is the construction which has been placed upon the statute by the Insurance Department of the State at all times since its enactment, and the construction which the plaintiff companies themselves have heretofore acquiesced in and acted upon in their application for increase of rates. The stand now taken by them has the appearance therefore of having been contrived by ingenious counsel, or by possibly more ingenious insurance accountants, for the purposes of this case."

The cost of procuring insurance is approximately forty per cent of the premium paid. Now what happens? At the end of the test period all unearned premiums are deducted, that is, they are not counted as a part of the resources of the company accumulated during the test period. But the forty per cent cost of procuring it is *deducted*. Thus the plaintiffs very naturally say that an unearned premium is a liability instead of an asset. It certainly is, the way they figure it. Yet they have collected the unearned premiums, they have the cash in hand, the cost of procuring it has been paid or incurred, and it is subject only to the hazard of future losses, and possibly occasional cancellation. At the end of the period under consideration the unearned premium in the hands of all the companies amounted to $17,061,209. That was substracted because not yet earned. But, the cost of procuring it was also substracted. That is, the *gain* on that much business could not be considered, but the *expenses* of it could be considered.

Suppose on the last day of the test period the several companies had written insurance on which the premiums were $100,000. That might easily be done because they wrote nearly $20,000,000 worth in premiums during that year, being considerably over a million and a half per month. The cost of producing that, approximately forty per cent, would be $40,000. Not one dollar of those premiums could be counted as an asset in the profits, but the $40,000 cost must be deducted as an expense on *other business done*. Thus, if that $100,000 worth of insurance had been transacted the next day, it would have been a difference of $40,000 in favor of the State.

They say that an unearned premium is worthless, yet they invest large capital in the business, spend a lot of money in equipment for transacting the business and incur enormous expense in procuring and producing that unearned premium. Every premium on every risk that is written is unearned the moment the contract is entered into. Their entire business is conducted for the purpose of acquiring unearned premiums and nothing else. Unearned premiums are the total result of the whole underwriting business, and yet they say they are worthless. Even a person with no bookkeeping experience would say that if this money which an insurance company has acquired in its business is not to be counted among the assets, certainly the expense of producing it ought not to be counted against the other business to be considered in the test. Their own figures show that the probable losses exceeded little or no more than fifty-five per cent of the premiums received.

These unearned premiums then are at least worth forty-five per cent of their face, but the probable losses have already been deducted on other losses occurring during the test period. Something is said in the evidence about the Richard method of figuring underwriting

profits. Instead of charging off all unearned premiums, Richard estimated that the probable losses to be paid on the risks represented by those premiums would be fifty-five per cent, thus estimating the unearned premiums to be worth forty-five per cent of their face, and he added that proportion as a part of the earnings. That at least is more just than the method adopted by the plaintiffs, who discard unearned premiums altogether. But even that is wrong, because it does not take account of the fact that losses occurring during the test period have been paid on policies written *before* the test period.

The companies argue that the solvency test must be applied. That is, the premiums must be valued only at what the company should realize on them in case it should cancel all the policies. The solvency test is no test at all. The assets of a going concern are never of the same value as the same assets would possess in the case of a forced liquidation. The companies do not have to cancel the policies, it is not to their interest to cancel them, and there is not a remote possibility that they would cancel them. The possibility that the insured would cancel their policies is so remote as to be negligible. The respondents have put forward a very convincing argument on another branch of the case that in estimating results in this case we should not consider mere possibilities, nor resort to conjectures. That reasoning should be applied here.

The referee, in holding with the plaintiffs in that matter, says that method of arriving at the earnings is not satisfactory. It is not only unsatisfactory, it is utterly indefensible. Any method which makes an asset a liability, turns a profit into a loss, shows a profitable business to be a losing business and writes enormous gains for a long period off the books, cannot be correct on any principle.

It is said that, taking the whole life of an insurance company, that method would ''wash out'' in the end. It could never ''wash out.'' Take any period during the life of a company, whether long or short, it would not be correct. It has been shown that the five-year period is not correct. For a twenty-year period it was false. A one-year period would not turn out correctly, and at the end of a fifty-year franchise it would not be correct, because the company would have been profiting by the error all through its life, and at the end of the period there would still be unearned premiums which would have to be liquidated in some manner.

The $17,000,000 of unearned premiums remaining at the end of the test period here is not counted as an asset, but the cost of producing it, nearly $7,000,000, is deducted from the assets. That is offset to some extent by the unearned premiums added at the beginning of the period, amounting to about half as much as the unearned premiums subtracted at the end. The former may be balanced against the latter, and that would still leave in the neighbor-

hood of three and a half million dollars deducted as an expense at the end of the period without any reason for it whatever.

The referee says the weight of the evidence shows that the method adopted by the plaintiffs is the correct one. Undoubtedly; since the respondents had to produce the evidence, they put forward the most skilled accountants in the country to swear that such was the way their several companies kept their books for rate-making purposes. It seems to us that the method is supported by the weight of expert skill in managing statistics, skill in summoning phantoms and in making realities vanish.

The method for ascertaining profits contended for by the State is to take the premiums actually received and subtract the losses and expenses paid during the test period. The companies themselves have approved the method. If it is faulty they cannot complain because their accounts afford no other way. It is the way other lines of business estimate their profits. The five-year period is taken by the Legislature, presumably on the theory that the period will fairly reflect the character of business done during the entire life of the corporation, at least of the aggregate business of all the companies.

IV. The State claims and the insurance companies deny that *interest* on unearned premiums should be accounted for as part of the underwriting earnings of the companies. This amounted in Missouri during the test period to $2,301,132. That is

**Interest on Unearned Premiums.** the sum stated by the defendant's counsel and is somewhat smaller than the sum mentioned by the referee, but the difference is not important. It is greater, as noted in Paragraph II, than the interest on capital and surplus.

The referee quite lucidly discussed this subject. He pointed out that insurance companies have for investment their capital stock; their surplus; *their underwriting receipts,* and receipts from *investments on these various funds.* He then made this comment: "As to earnings arising from the *investment of underwriting earnings* it is to be remembered that these underwriting profits or earnings are the *net fruit* to the insurance companies of *their underwriting activities.*" He said further of the unearned premiums: "This money is paid in advance by the policyholders and until it becomes earned premiums or is refunded because of cancellations, it is required to be held by the companies in large part as a reserve fund. This fund is not available for distribution in the form of dividends, and in a sense is held by the insurance companies in trust for the policyholders. It does not belong to the policyholders, it is true, but it is equally true that it has not yet become the absolute property of the plaintiffs. It is at all times possible for the policyholders to withdraw the entire fund from the insurance companies by canceling their

policies. *This fund is kept invested by the plaintiffs and a very considerable income is derived therefrom."*

This is the conclusion of the referee from the evidence produced. The last sentence is a finding of fact.

The plaintiffs have a great deal to say about investment earnings and they attempt to class all investment earnings together as having nothing to do with the underwriting business, but the tabulations show that the investment earnings are of two kinds: the earnings arising from the investment of capital and surplus and those arising from the unearned premiums. We have taken account of the earnings arising from the investment of capital and surplus in Paragraph II above and refuse to allow that as a part of the underwriting profit for which the insurance companies are accountable for rate-making purposes.

As the reports show, the companies had on hand at all times during the five-year test period very large sums received in Missouri as unearned premiums, ranging from about ten million dollars at the beginning of the period to more than seventeen million dollars at the end of the period, averaging over twelve million dollars in hand all the time. This money, as the referee finds, was invested and earned profit. The amount given as the earnings, $2,301,132, shows that it was kept well invested and earned as much in proportion as capital and surplus. The capital and surplus allotted to Missouri was a little over fifty-four millions, or an average of something less than eleven million dollars per annum.

Notwithstanding those book figures, the plaintiffs reason that there is no such thing as interest on unearned premiums; that in fact it cannot exist. The argument by which they arrive at that conclusion is extremely ingenious and is characterized by shrewd avoidance of patent facts. As we understand it, it amounts to this: In order to have interest on a fund there must be a principal sum and a term of time in which that sum is in existence. No unearned premium continues the same for any appreciable time. From day to day or month to month it ceases to become unearned premium and becomes earned premium. It diminishes by the process of attrition, as the referee aptly says. The unearned premium is gradually worn away and washed into the volume of earned premium. Therefore, if a thousand dollars of unearned premium were loaned out at interest today, there would not be a thousand dollars of that unearned premium tomorrow, but it would grow less and less until, perhaps, when the loan became due it would all be earned premium, and you could not segregate that part of the interest which accrued on the unearned portion from that part which accrued on the earned portion. Therefore, the earned premium "reserve," so called, is a myth. Plaintiffs' counsel then argue that "the division of premiums into

earned and unearned premiums is a rational division, not of the proceeds of premiums from policyholders, as our learned opponents assume, but a bookkeeping division used as a means of segregating an income period.''

Thus we are informed that the separation of the income from earned and unearned premiums is a bookkeeping fiction.

The answer to that argument seems plain enough. The companies have had, at all times during the test period, millions of dollars on hand constituting the unearned premiums. In Missouri it has averaged more than twelve million dollars. If a dollar of unearned premium ceases to become such and becomes a part of the earned premium, another dollar of unearned premium is paid in. As the fund at the one end is worn off by attrition, it is increased at the other end by accretion, so that the *fund* remains practically intact and continually 'earns profit. Because you cannot put your finger on the particular dollar that earns the interest, there is *no interest* on the fund of which it is a part, though each dollar removed from it is replaced by another dollar just as good. It would be just as logical to say that the United States Standing Army could not fight because its soldiers are gradually killed off or discharged and replaced by efficient recruits, so that in a generation none of the original soldiers remain.

By what sort of reasoning can it be separated from underwriting earnings? As the referee has found, it is *not* distributable as surplus. Though the money is in possession of the companies, it cannot be declared in dividends to the stockholders. Common sense and common reason woud conclude that the premium being unearned, if it grows, the accretion is unearned. But whether the interest becomes the absolute property of the companies as soon as it accrues or not, it is a profit derived directly from the earnings of the underwriting business, and not from investments of distributed or distributable funds.

The plaintiffs present an elaborate argument to show that the unearned premium does not belong to the policyholders, but is the property of the companies; that it is not a debt to the policyholders, nor held in trust for them. It is retained to provide against contingent losses. In that same connection the plaintiffs say that the segregation of the unearned premium is a separation of the surplus into a *distributable* and *non-distributable* surplus. That is, the unearned premium is not distributable, while the earned premium is distributable. If the earned premium remains in the surplus, its earnings would pass to the credit of the investment side of the corporation activities. But as long as it is not distributable, it cannot be said to be surplus at all. If, from the time it is paid until it may be distributed, it grows by additions of interest, the increase

goes with the principal as a part of the underwriting profits; just as the interest on a note is part of the debt represented by the note.

In this connection it must be remembered that the plaintiffs have argued very forcibly on another point—that unearned premium is not an asset at all, but a liability; that the company did not own the unearned premium at any time, but held it subject to the contingency that it might be demanded. Thus the insurance companies own the unearned premium for the purpose of claiming interest on it as a part of the investment income, and they do not own it for the purpose of accounting for it as a part of the underwriting earnings. It is an underwriting liability for one purpose and an investment asset for another purpose. It is a profit for the purpose of attaching it to the surplus, but it is not a profit for rate-making purposes. The interest does not exist because you cannot designate the particular premium which earns the interest, but you can segregate the principal for the purpose of calling it an investment of funds owned by the companies.

It is suggested that we cannot count the unearned premiums as underwriting profit unless it is absolutely owned by the insurer. It is therefore argued that we cannot count the interest on the unearned premium as underwriting profit because that, in effect, would be compelling the insurer to pay interest on its own money to the insured. The argument thus assumes that no funds owned by the insurer, no matter how acquired or how used, can earn a profit which can be attributed to the insurance business, and that the policyholder must own the money used in the insurance business before the earnings of it can be called underwriting earnings.

We are not taking an account between the insurance company and the policyholder; we are trying to find out how much the insurer profits by its insurance business.

The insured pays his premium and has no further claim on that specific money, but he holds a contract which the insurer must perform, and if it holds that unearned premium for the purpose of securing performance, is it not *used* in the underwriting business?

The Insurance Company, at its organization, has the contributed capital of its stockholders. What income it receives by investment of that fund does not come from the underwriting business. That fund, as shown above, is increased from time to time by its own earnings, and by appropriations from the distributable surplus arising from the underwriting business. At what point do the underwriting earnings become investment surplus? Certainly not until they cease to be used directly in the underwriting business, and become distributable assets. Much is said about the reserve which an insurance company keeps on hand to meet the payment of losses and expenses. The evidence justifies the conclusion that this fund practically coincides

with the unearned premiums. While it is invested and draws interest, it is no part of the investment fund; it is invested merely to safeguard it until it is needed, or until it becomes distributable. The plaintiffs do not class it with their other invested funds. It is used in the underwriting business, and the interest on it is a part of the profit of that business.

Suppose a judgment is rendered on an insurance policy, and the company sets aside a sum sufficient to meet the judgment. The company appeals the case and the judgment after three years is affirmed. The company pays it with interest accrued on it out of the money set aside for the purpose, which in the meantime has drawn interest so that it exactly satisfies the judgment. According to plaintiff's argument the interest on the judgment would be an underwriting loss, while the interest or money set aside to pay it would be an investment profit. Common sense would say that the fund is used in the underwriting business, and the interest accruing on it is attributable to that business. The entire unearned premium reserve is in that exact position; what it earns while it is used in the underwriting business is underwriting profit.

It is manifest that if premiums were paid after the services were rendered, instead of in advance, the rate would have to be increased; not only to meet interest on the deferred payment, but also to cover losses from failure to collect. In that case there would be no unearned premiums, but the increased rate would make such a difference in the sums received that it would be a mere conjecture as to how the five years' accounting would compare with present conditions. Taking all respondents' arguments on the subject, the ultimate logical conclusion is this: There never can be any underwriting profits. For, no premium can be counted as profits before they are earned; after they are earned they go into the investment surplus and cannot be counted as underwriting profits.

After all, however, we may reason about the character of unearned premiums and interest on them, the statute settles the matter.

Section 6281, Revised Statutes 1919, required each of the companies to report to the Superintendent "the total amounts of its earnings on unearned premiums." Defendants assert, and plaintiffs do not deny, that the Rating Act containing that provision was the joint creation of the State Insurance Department and the insurance companies. It was satisfactory to them at the time. Why put it in the law if the Superintendent was not to consider it in making rates? Why embody in the statute a recognition of a phantom, a requirement to furnish evidence of something which does not exist? We regard that statute as a legislative determination that interest on unearned premiums is an underwriting profit, for the legislative body had no concern about any other kind of profit.

V. The insurance companies were granted an increase in rates of fifteen per cent on certain classes of risks in January 1920. That increase was in partial effect during only two years **Effect of** of the period under consideration. The plaintiffs con-**Prior Increase.** tend, and the referee found, that the effect of that increase was not to be taken into consideration in determining what rates shall be for the future.

It is first important to consider the effect already had of that increase. Mr. E. G. McGee, special examiner for the Insurance Department, explained it. The increase applied only to seventy-one per cent of the total business of the State. It did not go into effect at once, but went into effect graduallly, as risks were reinspected by the companies or by the rating bureau. In 1920 the increase applied to about twenty-one per cent of the seventy-one per cent, and in 1921 twenty-eight per cent, so that during the five-year test period there were three years in which the increase had no effect and in the remaining two years only partial effect. In 1920 the twenty-one per cent effective caused an increase in the premiums received of $489,683. The increase effective in 1921 increased the premiums for that year $594,761. These added together made the total of $1,084,444. If the entire increase of 1920 had been in full effect during the whole test period, it would have amounted to $8,777,489. Substracting the $1,084,444, you have $7,693,045 as the amount of the additional premiums which would have been received by the companies during the test period if the increase had been in full effect during the five years. This is sufficient to more than offset the effect of the reduction of 1922, both the increase and the reduction being in effect.

The plaintiffs advance two reasons why they claim this increase should not be considered. First, that it is mere conjecture as to what effect it would have in the future. They say that "all such speculations are foreign to any proper consideration and so are any rate changes which may have occurred from time to time during the five-year period in question." If it is a mere speculation as to what effect the fifteen per cent increase would have when put in full operation, then the plaintiffs should make no complaint of the order decreasing the rate ten per cent, for the effect would be a mere matter of speculation. As a matter of fact, Mr. McGee showed exactly what the effect of the increase was as put in operation, and the figures are as exact as such matters can be as to what the effect would have been if it had been in full operation. But, of course, all such figures for the future are dependent upon the actual business done and other considerations, which would effect the reduction as well as the increase.

There was no dispute as to the accuracy of Mr. McGee's figures in respect to the past effect of the increase. He said, in relation to the future effect of the order increasing the rates, that it would be in

full effect in 1925 or 1926, but the companies could put it in full operation much earlier by employing sufficient force to undertake the inspection necessary. It was with the companies whether they would put it into operation sooner or later. The reduction order was to go into effect November 15, 1922, nearly three years after the increase had been ordered. By that time, with the same progress already made, there would be nearly fifty per cent of the classes affected under the increased rate, with every probability that it would reach and overcome the effect of the reduction in the course of another year. Thus the increase would be generally effective soon after the reduction order went into effect and would more than offset it during the next five-year period. This is calculated with reasonable certainty.

The second reason advanced by the plaintiffs why this increase should not be considered, is that the statute does not authorize it. Section 6283, Revised Statutes 1919, empowers the Superintendent to "investigate the necessity for a reduction of rates" and if it appears that the result of the earnings for five years next preceding the investigation "shows there has been an aggregate profit therein in excess of what is reasonable" he shall order a reduction. The plaintiffs contend that that limits his consideration to factors in operation during the test period; that he cannot consider anything which would affect the rates at the time the order is made, whether it would reduce or increase the earnings that would accrue *after* the order was made. Let us see what would be the effect of that theory. There are two factors connected with the rates under consideration here which affected the rates during the test period and have a different effect after the order was made. One is the war tax which was in operation during the test period, not in operation now, and the other is the increase of fifteen per cent which was not in effective operation appreciably during the test period and will be in operation after the order goes into effect. Under the theory of the plaintiffs neither of those factors could be considered. The elimination of the war tax would reduce the expenses for the future. But that is not to be considered. The increase of rates in 1920 increases the income for the future. But that is not to be considered. *The superintendent can only reduce the rates the exact amount of the discovered excess, is* the theory.

In thus narrowing the effect of the statute, the plaintiffs make the letter of the law destroy its purpose. The purpose of the examination and investigation was to provide reasonable rates for the future. The Superintendent "*shall order such reduction of rates as shall be necessary to limit the aggregate collections by insurance companies in this State to not more than a reasonable profit.*" This part of the statute must be given effect as well as the part quoted above; they

must be reconciled if possible. "Not more than reasonable profit" can have no application except to the future and is to be determined by the factors affecting the rates for the future *as they exist at the time the order is made*. If the war tax is no longer on, then he must consider that as affecting the expenses for the future. If a prior increase becomes effective, then he must consider that as increasing the income for the future. If not, then what becomes of the effect of the statute that he "*shall*" reduce the rates to not more than a reasonable profit? That is mandatory and imperative. He cannot reduce rates so as to affect previous profits. The only purpose of his order is to secure reasonable profits in the future.

For the purpose of this case, let us give the statute the narrow construction contended for, that he cannot order a reduction *unless* the profits have been therefore too large and he can only consider what the profits were during the test period in determining whether they were too large. But he is not limited to that in considering what *thereafter* would be reasonable. If, from the information before him, he is justified in finding them theretofore too high, he may reduce them to what *will be* reasonable and in doing so he may consider every factor which would affect the rates for the future.

Suppose the war tax had been in operation during the five-year test period, and was equal to the total amount of the decrease ordered, ten per cent, and suppose during the period the companies had made something more than a reasonable profit, no matter how much, nor how little; he would be justified in reducing the rates so as to be reasonable, and take into consideration that there is no war tax at the time he makes the order and will not be thereafter. He is not limited in his reduction to the exact amount of the excess he found in the test period. Thus, both of the clauses quoted may be given effect.

Suppose also that there had been an increase of rates of ten per cent the year before the reduction was ordered, and then a year later the respondent makes an order reducing the rates ten per cent, the exact amount of the previous increase, so the reduction would exactly neutralize the increase. Under the argument of the plaintiffs you could consider the reduction, but could not consider the effect of the increase. In other words, you could not consider that the reduction had no effect whatever, if taken into consideration with the increase. The intention of the Legislature certainly did not contemplate such a construction.

Suppose the order of 1920 had been a reduction of the rates of fifteen per cent instead of an increase, and that reduction was to go into effect in the same way the increase was to go into effect, would the insurance companies contend that that previous reduction, not yet fully effective but to become effective, should not be considered

in determining whether an additional reduction would provide for a reasonable profit? Their managers are not human if they would; they would not be acting in accordance with the known sagacity of insurance officers and agents if they would permit the reduction order to be considered without protesting the effect of the previous reduction order. We think, therefore, that it was entirely proper to take into consideration the previous increase of fifteen per cent.

VI. In the city of St. Louis commissions were paid to agents much higher than in any other part of the State. These excess commissions amounted during the test period to $2,496,718. The plain-

**Excessive Commissions: Excepted Cities.** tiffs explained that by saying that in larger cities, called excepted cities, such as St. Louis, brokers controlled the placing of a large portion of the insurance written and they charge the insurance agents a commission for placing the business with them. Thus the people in the rest of the State must pay a higher rate for their insurance in order that the insurance agents in the city of St. Louis may receive a higher commission and pay the brokers a rake-off.

The plaintiff attempts to justify that by saying that it has been in operation for a long time, and it is impracticable to do away with the custom; that the commissions to brokers in St. Louis are not paid by the companies, but paid by the agents out of their own funds. The agents pay it out of their own funds, but they recoup in charging larger commissions for the risks they write, and thus increase expenses which are charged up as a part of the aggregate expense of operating in Missouri, and therefore must affect the rates.

Mr. George H. Bell, testifying for the plaintiff, said that *practically* those increased commissions did not affect the rates in Missouri, while *theoretically* they might. If it is not intended to have any practical effect, it should not be charged. No excuse or justification for so charging it and thus affecting the rates is presented anywhere. People in the State of Missouri should not be required to pay a higher rate for their insurance in order that agents in St. Louis may have an easy time and divide their commissions with brokers. People would insure their property just the same as they do in that city, even if agents did not get their business from the brokers, nor compete with each other for the favors of brokers.

VII. The plaintiffs set forth a table of expenses *apportioned* to Missouri, expenses which did not accrue in Missouri on account of

**Income Tax.** business done in Missouri, but head-office expenses and the like which apply to the whole country. This apportioned expense amounted during the entire period to $6,938,489. We assume that the expenses apportioned to Missouri are

315 Mo.—10.

in the direct ratio of the business done in Missouri to that of the rest of the country.

One item of the apportioned expense deserves special notice, the Federal income tax, $542,933, which is apportioned to Missouri on the theory that it is Missouri's part of the income tax paid. But according to the figures presented by the plaintiffs they had no taxable income in Missouri; they operated at a net loss during the test period. In presenting their income tax returns they use the same method which they apply in determining their underwriting profits in Missouri. We will not presume that in handing in their statement of their taxable income, they showed their income higher than that which they presented in this case for rate-making purposes. They show, instead of a net income which could be taxed, a net loss, so that no income tax was paid for Missouri. Therefore, that item was improperly charged as an expense to the State of Missouri.

VIII. Another item amounting to $628,123 was a war tax paid on Missouri premiums. The law imposing that tax was no longer in operation at the time the reduction order was made, but in **War Tax.** Paragraph IV we have sufficiently explained why that should not be charged. Plaintiffs present no reason why that tax, which would not be imposed from the times the order was made, should be listed as an expense in fixing future rates.

IX. Much discussion is taken up as to whether the apportionment to Missouri of head-office expenses is reasonable, or whether any expenses are reasonable. The Superintendent in making his order suggested the unreasonableness of expenses; that **Fraudulent Losses: Improper Inspection.** policyholders were burdened with fraudulent losses because of over-insurance, improper inspection and the like. We find it unnecessary to go into those matters chiefly because facts in regard to them are unsatisfactory and because unnecessary for our purpose here. The Act of 1923 gives the Superintendent more latitude and additional powers in relation to investigation of those things, so that in his future investigations of the insurance conditions the subject may come before us for consideration.

X. We summarize our conclusions as follows:

Premiums 1917-1921 .............................$83,502,181
Add interest on unearned premium................. 2,301,132

Total income ...............................$85,803,313

Losses and Expenses ...............$80,161,057
Deduct excess commissions
    in St. Louis ..........$2,496,715
Deduct Federal income tax   542,993

                     $3,039,708   3,039,708

Actual loss and expense ..............$77,121,349   77,121,349

      Actual net earnings .........................$  8,681,964
  If the war tax ...................................$   628,123

had been in operation it would have been .............. 9,310,087
  If the increase of 1920 ........................... 1,084,444

had not been in partial effect, the net earnings would have
been ...........................................................$8,225,643

As stated above, a reasonable profit is five per cent on the business done, premiums received, and three per cent additional for conflagration hazard, or eight per cent, which would be $6,680,169 for the test period. Therefore, $8,681,964 was an unreasonable profit and justified a reduction under the circumstances shown. With the war tax eliminated it would have been $9,310,087, about forty per cent more than what was conceded to be a reasonable profit.

. The effect of the increase ordered in 1920 can be estimated from the effect it had in that year and the following year, 1921. The evidence shows that the increase was applied gradually on reinspection, but that the companies could apply it entirely if they should see fit to increase their inspection force. As it was, a much larger amount was applied in 1920 than in 1921. But we may assume that the average increase in the application of the increase would be the same in the next two years, 1922 and 1923. Since the reduction order of ten per cent was to take effect only late in the year 1922 the first year during which it was in full effect was the year 1923. So we must estimate the probable effect of the fifteen per cent increase as applied in that year. The increase in the first two years, 1920 and 1921, yielded $1,084,444 additional profit. We may assume that the two following years, it would yield twice that much, or $2,168,888. It would do so at the same average rate of inspection and application. Of course, more of that would be credited to the latter year 1923 than to 1922, naturally in the proportion of four to three. That is, there should be, with an average rate of increase, the new rate in the fourth year should yield four-thirds as much as it yielded in the third year. Then the way to arrive at the probable yield from the

increase in 1923 would be to divide that sum by seven and multiply by four.

Divided by 7, ................................$2,168,888

$$\begin{array}{r} 309,841 \\ 4 \end{array}$$

Multiplied by 4, ...............................

$1,239,364

The last figure is the probable yield from the increase in 1923. Now the net profit during the previous five years, without taking account of the fifteen per cent increase as shown above, was

$8,225,643.

Divided by 5,                         $1,645,128  per year, average
Add                                   $1,239,264

Total net profit           $2,884,392 for 1923

This would be net profit for the year 1923 with the fifteen per cent increase in operation as far as it was effective at that time. That multiplied by five would give, for five years, $14,421,960. The premiums collected on fire, lightning, hail and windstorm insurance during the five-year period, affected by the reduction order, was $71,347,512.

$14,421,960
Subtract ten per cent          7,134,751

And you have              $ 7,287,209 with the reduction of ten per cent in full operation and the increase of fifteen per cent in operation as far as it was probably applied at that time. This is more than the eight per cent conceded to be a reasonable profit, and it would be increased in subsequent years as the fifteen per cent increase was applied until the total yield would be much more than the conceded reasonable profit.

Therefore, we conclude that on the evidence before the referee and the trial court the reduction order was authorized as it was made. The judgment of the trial court is, therefore, reversed and the proceeding dismissed. *Atwood, Graves* and *Walker, JJ.,* concur; *Ragland, J.,* and *Blair, C. J.,* dissent; *Otto, J.,* not sitting.

RAGLAND, J. (dissenting).—I am unable to concur in some of the conclusions reached in the majority opinion. The questions involved are not only of present moment, but as time goes on will become increasingly important. For that reason I feel it incumbent upon me to set forth in some measure the grounds of my dissent. For lack of time to prepare a dissenting opinion which accords with conventional standards I shall content myself by quoting from the opin-

ion prepared by me soon after the submission of the case three paragraphs, dealing respectively with the questions of investment earnings, interest on unearned premiums and the proper method of determining profits—whether on the basis of earned premiums or that of premiums received—and then adding very briefly the specific grounds on which I base my non-concurrence.

"I. The assumption by the State of the power to regulate the rates which may be charged for insurance, on the ground that the business is clothed with a public interest, is of comparatively recent origin, the first statute in this State having that end in view (Secs. 6283 and 6284, R. S. 1919) having been enacted in 1915. Whether investment earnings of the insurers should be taken into account in determining rates, as well as many other questions having a bearing on rate regulation, must therefore be resolved upon a consideration of the nature of the business of underwriting and the application of general principles rather than upon precedent.

**Earnings on Investments.**

"The underlying economic principle of all insurance is the distribution of loss resulting from designated perils among a great many persons so that the loss to the individual will be thereby minimized. The business of fire insurance contemplates the existence of a known danger to which all property owners are exposed, but from which only a few will suffer loss. The function of the insurer is to collect from the great number exposed to the peril a sufficient sum to reimburse the few who actually suffer loss therefrom. And this is true whether the insurer be a mutual company, or a stock company. There are certain fundamental differences, however, between a mutual company and a stock company which affect the amount of premiums which each may rightfully collect from its policyholders. Speaking generally, a mutual company may collect from the persons insured only such sums as in the aggregate will cover the losses, which under the law of average can with reasonable certainty be forecast, and in addition thereto such further sums as are necessary to meet the expense of conducting the business. If such sums prove to be inadequate the insured persons are subject to assessments to the extent necessary to make up the deficit. The policyholders of stock companies on the other hand are not subject to any such contingent liability. In consideration of definite and fixed premiums these companies assume all liability, including that for losses resulting from an abnormal experience. For its services in underwriting, that is, collecting from the many a fund with which to pay, and paying, the losses of the few, and the assumption of all liability for losses, a stock company is entitled to remuneration. Consequently it may rightfully exact premiums which in addition to paying losses and expenses will be sufficient to yield a reasonable profit. The securing of such an under-

writing profit is in fact the fundamental purpose for which all stock companies are organized.

"In the case af a mutual company the contingent liability of all the persons holding similar contracts is deemed a sufficient guaranty that the funds necessary to pay the losses suffered by the few will in any event be forthcoming. But as the contracts of a stock company have no such security behind them, such a company is required by economic as well as by municipal law to have at hand at all times a sufficient fund, in cash or prescribed securities, to discharge in full every liability which it has assumed or incurred. Such fund is made up for the most part of capital stock and surplus, the surplus in the first instance as well as the capital stock being contributed by the stockholders of the company. This fund is not in any proper sense employed in the business of underwriting. It is in the nature of a pledge put up by the insurer to secure the performance on its part of its several undertakings, and if in an emergency the fund be called upon for the payment of losses or expenses to such an extent that it no longer covers the company's maximum liability, it must be immediately repaired by contributions from the stockholders, or else the company must cease business. The capital and surplus being therefore a guaranty fund must at all times be kept intact. It is not, however, permitted to remain inactive, but is invested in interest bearing securities. The earnings from these investments are a by-product, so to speak, of the business of underwriting, a business always initiated and prosecuted for the purpose of making and underwriting profit. As already pointed out a stock company is clearly entitled to a reasonable underwriting profit on account of the service it renders and the liability it assumes. Can there be any reason why it is not entitled to receive in addition such returns as it may be able to secure from the funds it has been compelled to withdraw from the active channels of trade and commerce in order merely to furnish the requisite guaranty that it will perform its contracts as an insurer? On what theory of law or morals can it be compelled to accept earnings on its own capital independently employed in lieu of the reasonable profit it is entitled to derive from the business of writing insurance, or even in reduction of that profit?

"Impressed with the great peril of conflagrations, such as the Chicago Fire and later the San Francisco Fire, the majority of stock companies began a number of years ago to largely augment their capital and surplus. This was accomplished through additional contributions by the stockholders and the passing to the surplus, earnings of all kinds instead of distributing them as profits. Through this process millions of dollars were in the course of time added to the surplus of most of the companies. As a consequence the interest earnings on the capital and surplus now yield in many instances divi-

dends which, if computed on the basis of capital stock, are enormous, and are more than generous if reckoned on combined capital and surplus. To take these investment earnings into consideration in determining insurance rates is equivalent to the State saying to the companies: inasmuch as the returns on your investments are now sufficient to yield you a reasonable profit, you must hereafter write insurance and subject your accumulated capital to its hazards without compensation.

"Appellant in support of his argument that the investment earnings of insurance companies must be taken into account in determining rates cites cases holding in effect that the owner of private capital who employs it in the public service is entitled to a reasonable return thereon and nothing more. These cases are without application. The insurance companies are not asking for any return on their private funds, even if they be deemed to be employed in the business of writing insurance. They are satisfied with the returns accruing to them from an independent source and the State cannot confiscate those returns under the guise of regulating rates of insurance.

"There appears to be some apprehension on the part of appellant lest policyholders in this State be charged with rates which are based in part on losses arising from the unsafe investment of funds. If in the foregoing we have set forth a proper conception of the relation of the capital and surplus of a stock company to its business of writing insurance, it follows inevitably that investment losses cannot be recouped through increased underwriting charges, but must be made good, if at all, by contributions from the stockholders.

"II. Fire insurance policies are ordinarily written for terms of one, three or five years. A single premium is paid in advance for the insurance for the full term, whatever it may be. Under the provisions of all policies an insured may at any time during

**Unearned Premium Reserve.** the term, if he so elects, present his policy for cancellation and demand a return of the unearned premium. The unearned premium, theoretically at least, is that proportion of the whole premium which the unexpired time the policy has to run bears to the full term for which it was written. According to legal standards, and perhaps economic as well, a stock company is solvent when, and only when, it has sufficient assets to pay all of its incurred losses and expenses and return as upon cancellation the unearned premium on all of its policies.

"The liability growing out of the obligation to return unearned premium is of course contingent upon the insured tendering his policy for cancellation. In order to ascertain the exact extent of this contingent liability of an individual company at a given time, it

would be necessary to make the computation on each of its outstanding policies. This being manifestly impracticable where there is a large volume of insurance in force to which new policies are being added daily and with respect to which the unearned premium is constantly changing through the lapse of time, arbitrary standards have been set up for determining the unearned premium liability. Under the Missouri statute it is 'estimated by taking fifty per cent of the gross premiums on all unexpired fire risks that have less than one year to run, and a *pro rata* of all those premiums on risks that have more than one year to run.' [Sec. 6222, R. S. 1919.] In insurance parlance 'a reserve' is maintained to cover unearned premium liability. But such a 'reserve' is purely a bookkeeping fiction. The rates are not loaded for the purpose of creating such a separate fund. None in fact exists. The phrase 'unearned premium reserve' merely designates the amount of the contingent liability to which all the assets of a company are subject. Of course if those assets are not sufficient both to discharge incurred liabilities and to cover the contingent liability a proper 'reserve' is not being maintained.

"All the assets of a stock fire insurance company, by whatever name designated, are its absolute property, and so long as it is a solvent going concern its policyholders have no more interest therein than the creditors, actual and potential, of a trading corporation have in its assets under similar conditions. They are not entitled therefore to appropriate earnings arising from the investment of any part of the company's assets to the reduction of the cost of their insurance below a figure that will yeild a reasonable underwriting profit.

"III. Section 6282, Revised Statutes 1919, is *in paria materia* with Section 6283 heretofore set out. A reading of the two sections together makes it clear that the 'earnings in this State' referred to in the latter are to be determined from 'the aggregate amount of . . . premiums, losses and expenses for or on account of business within the State for the five preceding years . . . and in addition thereto . . . earnings on unearned premiums.' For constitutional reasons indicated in a preceding paragraph 'earnings on unearned premiums' must be eliminated from consideration. The intent of the statute in other respects must, if it can be ascertained, be given effect.

"As heretofore stated it is the contention of the companies that the earnings of a given period on which underwriting profit can be predicated are determined by deducting from the premiums earned during that time the losses and expenses incurred. The method employed for ascertaining the amount of premiums earned is this: Add the unearned premiums at the beginning of the period to the aggre-

gate net premiums received during that time and deduct from the sum the premiums unearned at the end of the period. Incurred losses and expenses are arrived at in this way: Subtract the outstanding incurred losses and expenses at the beginning of the period from the losses and expenses paid during that time and then add the losses and expenses unpaid and outstanding at the end of the period. According to the method of determining earnings just outlined respondents lost during the period in question in their underwriting business $7,010,200. During the entire period their business was steadily expanding, the rate of increase being pronounced. As a consequence the figure indicating unearned premium at the end of the period was much larger than the one representing unearned premium at the beginning. Had those figures been transposed, that is, if the larger one had represented the unearned premiums at the beginning of the period and the smaller one the unearned premiums at its close, according to the method of computing earnings just described the companies would have had an underwriting profit of more than $9,000,000. To express it differently: when the companies are prosperous and increasing the volume of their business, according to this method of computing earnings, they are losing money; when their underwriting is falling off they are piling up profit. It should not be forgotten that 'unearned premium' is but an arbitrary measure of contingent liability. Such liability while it necessarily increases with an expanding business is by no means a true exponent of underwriting earnings. An insurance accountant of many years experience, testifying for respondents, stated that while the fire insurance business had been rapidly increasing in volume during the last twenty years, the companies according to the method of computing earnings which they now invoke had during the whole of that time made an underwriting profit of less than one per cent. It was the witness's *theory* that the huge surpluses which they have managed to accumulate during that time resulted from investment earnings, but it is unbelievable that corporations organized for profit would have continued for such length of time to hazard their capital in a business of underwriting if that business in fact yielded no profit. The method of determining profit which respondents seek to have applied is clearly unsound.

"In their bookkeeping the companies at the close of each year strike what their accountants term a trade balance. This balance is derived by deducting from the aggregate net premiums received during the year the total losses and expenses paid during that time. The net premiums consist of all premiums received less the *pro-rata* returned upon cancellation and sums paid for reinsurance. When a loss occurs an estimate of the amount is entered upon the books as an 'incurred loss.' When the loss is subsequently adjusted

it is paid. The amount paid is frequently reduced by salvage or recoverable reinsurance. But losses regardless of when they occurred are paid out of current premium receipts. The distinction between incurred expenses and paid expenses is negligible. All expenses with the exception of taxes are ordinarily paid within the year in which they are incurred.

"The annual trade balance of a company engaged in a continuing business, being the difference between its receipts on the one hand and its expenditures on the other, during the preceding year, must necessarily reflect with a fair degree of accuracy its earnings for that period. To be sure such balance would not be indicative of solvency as heretofore defined, nor would it properly represent net earnings if the distribution of assets upon dissolution were involved, but nevertheless it cannot be gainsaid that it does in fact constitute the clear earnings of the period embraced, if that period be considered a part from those which preceded it and those which follow, as is the case where a basis for rate regulation under the statute is sought.

"Based on the conclusions reached in the preceding paragraphs we are of the opinion that the 'aggregate amount of . . . premiums, losses and expenses for or on account of business within this State . . . for . . . five years next preceding' intended by the Legislature were the aggregate net premiums received and the losses and expenses paid during the five-year period. That is the construction which has been placed upon the statute by the Insurance Department of the State at all times since its enactment, and the construction which the plaintiff companies themselves have heretofore acquiesced in and acted upon in their applications for increase of rates. The stand now taken by them has the appearance therefore of having been contrived by ingenious counsel, or by possibly more ingenious insurance accountants, for the purposes of this case. On the basis of premiums received and reported losses and expenses paid the companies earned during the test period in question an underwriting profit of $3,341,124, or four per cent of the aggregate net premiums."

The only material divergence between the foregoing and the majority opinion dealing with the same subject-matter is in respect to Paragraph II. The latter opinion holds that in determining the underwriting profits of the companies interest on unearned premiums must be taken into account. The argument through which this conclusion is derived is in substance this: Unearned premium must, constructively at least, be segregated and kept apart from the other funds of the companies and held intact so that until it is earned it will at all times be available for return to the policyholder if cancellation be demanded, or for re-insuring if the insurer becomes in-

solvent or quits business, and as the unearned premium cannot be distributed among the stockholders as profits, but must be kept on hand until earned, the interest accruing on it is attributable to the underwriting business and is therefore one of the profit-making elements of that business. This reasoning seems to me to be specious. There is no magic in the word ''attributable.'' The interest earnings on so much of the companies' assets as would be consumed in re-insuring all of their risks are no more attributable to the underwriting business than are the earnings on the remainder of their assets, and it is conceded by the opinion that the latter cannot be taken into consideration in determining underwriting profits. If, however, the view that interest on unearned premiums should be charged up to the insurer in determining his underwriting profits be the correct one, then the method of arriving at profits which takes unearned premiums into account is wrong. Unearned premium, in whole or in part, cannot be reckoned as profit and at the same time the insurer be required to pay interest on it to the policyholder.

There is but one theory consistent with the companies' constitutional rights upon which it can be held that they must account for interest on unearned premiums, namely: that the premiums, being paid in advance, must be regarded as in a sense the moneys of the policyholders until earned by the elapse of time. For if the premiums as soon as they are received by an insurer become without qualification his absolute property, then certainly he cannot be required to pay to the  policyholders interest on them, or what is tantamount thereto, apply such interest to the reduction of the cost of their insurance. Such a requirement in that view would be plain confiscation. And if the premiums belong to the policyholders until earned, then until that time arrives the insurer cannot strike a balance for the purpose of ascertaining his profits. In other words, if the interest on unearned premiums enter into underwriting profits, such profits must be determined upon the earned premium basis.

 For many years antedating the enactment of our rate statute it was the universal custom and practice of stock fire insurance companies to compute their underwriting profits on the basis of earned premiums. And that is the basis for determining the net income accruing from the business of underwriting as recognized in the income tax laws both of England and the United States. It is therefore entirely possible that our rate statute contemplates the same method of ascertaining underwriting earnings and profits, and, if so, that the statute be upheld with respect to its provision that the earnings on unearned premiums shall be taken into account. But be that as it may, it is clear to my mind that the majority opinion is wrong in holding on the one hand that underwriting profits must be determined upon the basis of premiums received, which includes

both the earned and unearned, and on the other hand that interest on unearned premiums must be taken into account.

The majority opinion further holds that the increase of rates ordered in 1920, and which had not become effective at the time the reduction order was made, should be taken into consideration. To this I do not agree. The *power* as well as the duty, to order a reduction of rates is predicated by the statute upon this fact: that "it appears that the result of the earnings . . . *for five years next preceding such investigation* shows there has been an aggregrate profit . . . in excess of what is reasonable." In the face of this plain and unambiguous language how can it be held that the *estimated earnings of a future period* may be made the basis of such an order? There is no call for either a strict or a liberal construction of the statute. If its words be taken in their usual and ordinary sense there can be no mistake as to its meaning. The so-called liberal construction employed in the opinion merely masks the attempt to judicially improve (?) the handiwork of the Legislature. *Blair, C. J.,* concurs.